IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 06-00152-01-CR-W-SOW |
| ) | |
| REGINALD L. MCGLOTHEN, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant McGlothen's Motion to Suppress Any and All Statements of Defendant (doc. #22). For the reasons set forth below, it is recommended that this motion be denied.

I. INTRODUCTION

On April 19, 2006, the grand Jury returned a one count indictment against defendant Reginald L. McGlothen. The indictment charges that on or about January 26, 2006, defendant, having been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a V. Bernardelli, Model 80, .22 caliber pistol, Serial Number 05440 in violation of Title 18, United States Code, Sections 922(g)(1) and 924(e)(1).

On August 29, 2006, an evidentiary hearing was held on defendant McGlothen's motion to suppress. Defendant McGlothen was represented by retained counsel John L. Spencer. The Government was represented by Assistant United States Attorney Stefan Hughes. The Government called Officer Aaron Shillcutt and Sergeant Charles Huth of the Kansas City, Missouri Police Department as witnesses. The defense called no witnesses to testify.

II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On January 26, 2006, at approximately 2:00 p.m., members of the 1910 Tactical Squad of the Street Narcotics Unit of the Kansas City, Missouri Police Department were serving a search warrant for a residence located at 5208 Indiana. (Tr. at 4, 13-14) The primary objective of the 1910 Tactical Squad is to obtain search warrants from detectives, execute the warrants and then process the residence and any occupants of the residence. (Tr. at 13)

2. Sergeant Huth is a supervisor of the 1910 Tactical Squad and was present at the search. (Tr. at 13-14) Officers Aaron Shillcutt and Pat Foster were providing exterior security of the residence for the search team. (Tr. at 4-5)

3. The 1910 Tactical Squad entered the residence and secured it. They conducted a protective sweep of the residence for any occupants, but it was unoccupied. (Tr. at 14-15) Sergeant Huth protected the scene while the other members of the squad "dressed down." (Tr. at 15) After the members of the squad completed "dressing down," they relieved Sergeant Huth from his post, and he went to the police van and "dressed down." (Tr. at 15) The term "dressed down" refers to police officers removing their heavy vests and helmets and locking up their long guns. (Tr. at 15)

4. Sergeant Huth told Officers Shillcutt and Foster to keep an eye out for the owner of the residence. (Tr. at 15) He provided them with a picture of the suspect, Reginald McGlothen, and a description of McGlothen's vehicle: a blue and gray Dodge truck with Missouri license plate 907 TCO. (Tr. at 5, 15) Officers Shillcutt and Foster were told that McGlothen was a suspect for being involved in a couple of undercover drug buys. (Tr. at 5)

5. Officers Shillcutt and Foster were sitting in a marked patrol car facing eastbound at 52nd Street and Indiana. (Tr. at 5- 6) Officer Shillcutt observed a vehicle, southbound on Indiana, pass in front of the residence that was being searched. The vehicle matched the description of McGlothen's vehicle and contained a black male driver and a black female passenger. (Tr. at 6) Sergeant Huth also observed the vehicle pass the residence. (Tr. at 16)

6. Because the vehicle matched the description given to him, Officer Shillcutt exited his patrol car, approached the vehicle and conducted a car check. (Tr. at 6, 10) At that time, the vehicle was located at 53rd and Indiana. (Tr. at 6) Officer Shillcutt identified the driver of the vehicle as Reginald McGlothen. (Tr. at 6)

7. After the car stop, the officers contacted Sergeant Huth by radio to confirm they had stopped defendant McGlothen. (Tr. at 16) Sergeant Huth told the officers to tell McGlothen he was under arrest and escort him to the search scene so that Huth could

explain the charges to McGlothen. (Tr. at 16, 24-25)

8. Officer Shillcutt advised defendant McGlothen that a search warrant had been served at his residence. He then took McGlothen into custody. (Tr. at 7-8, 11) McGlothen was cooperative. (Tr. at 7, 10) He exited his vehicle and was placed in handcuffs. (Tr. at 7)

9. Officer Shillcutt conducted a search of McGlothen and of his vehicle. He found a large quantity of money on his person and two bundles of cash in the vehicle. (Tr. at 7)

10. Officer Shillcutt advised McGlothen that he was going to walk him back to the residence where he would receive further instructions from Sergeant Huth. (Tr. at 11) Officer Shillcutt then walked McGlothen to the residence, which was less than a block away. (Tr. at 8, 11) Because he was in the field and was not questioning defendant McGlothen, Officer Shillcutt did not inform defendant of his Miranda rights. (Tr. at 8, 12) This is standard operating procedure for the Kansas City, Missouri Police Department. (Tr. at 8-9) Defendant McGlothen did not make any statements during this time. (Tr. at 9, 12)

11. Officer Shillcutt released defendant McGlothen into Sergeant Huth's custody and returned to the vehicle. (Tr. at 9) Because of the volume of search warrants executed by the 1910 Tactical Squad, they utilize a different procedure for processing an arrest. (Tr. at 16) Instead of an officer arresting a suspect and taking him downtown for booking and completion of the paperwork, all processing and paperwork is completed in the field. (Tr. at 16-17) The suspect is brought to the scene and informed as to why he is under arrest. The ranking officers fills out paperwork containing basic information on the suspect such as height, weight, diseases and illnesses. (Tr. at 17) The officer also fills out an investigation arrest approval form stating the suspect is to be booked for a 24-hour investigation. (Tr. at 17) The paperwork is given to the driver of the transportation wagon, who takes the suspect directly to headquarters and drops him off. (Tr. at 17) Thus, there was nothing unusual about the procedures used in this case. (Tr. at 16-18)

12. Sergeant Huth met defendant McGlothen outside the front of the residence and introduced himself as a Sergeant with the Street Narcotics Unit of the Kansas City, Missouri Police Department. (Tr. at 18) Sergeant Huth told defendant McGlothen that he was executing a drug search warrant on his residence. (Tr. at 18) Defendant McGlothen replied "yes" when Sergeant Huth asked him if he understood. (Tr. at 18) Sergeant Huth then advised defendant McGlothen that he was under arrest for investigation of distribution of a controlled substance. (Tr. at 18, 25) Sergeant Huth did not recall exactly what the defendant said, but the defendant acknowledged Huth and nodded his head yes that he understood. (Tr. at 18) At that time, defendant McGlothen was in police custody and was not free to leave. (Tr. at 27)

3

13. Sergeant Huth took defendant McGlothen into the living room of the residence. (Tr. at 19) Sergeant Huth asked the defendant some basic questions such as what his name was and some standard medical questions such as whether he had any illnesses or if he needed to take any medication with him. (Tr. at 19, 26) These are the standard questions that are asked at every arrest. (Tr. at 26) Sergeant Huth did not advise defendant McGlothen of his <u>Miranda</u> rights. (Tr. at 26) Because Sergeant Huth does not ask a suspect who is under arrest any questions about the crime the suspect is charged with or under investigation for, he never advises a suspect of his <u>Miranda</u> rights. (Tr. at 26)

14. One of the officers brought out a firearm that had been located in the residence. (Tr. at 19) Sergeant Huth knew prior to executing the search warrant that defendant McGlothen was a felon. (Tr. at 28) After Sergeant Huth saw the gun, he advised defendant McGlothen that in addition to being under arrest for the investigation of distribution of a controlled substance, he was also under arrest for being a felon in possession of a firearm. (Tr. at 19-20, 28) In response, defendant McGlothen stated that the gun was his and that he bought it from a guy for protection. (Tr. at 20) Sergeant Huth told defendant McGlothen that he had not been read his rights and was not being asked questions about the firearm. Huth further advised him not to say anything else. (Tr. at 23) Defendant McGlothen repeated, "I just wanted to let you know I bought it for my own protection." (Tr. at 23)

15. At the time he made the statement, about buying the gun for protection, defendant McGlothen had been inside the residence for approximately ten minutes. (Tr. at 22) He had not been threatened by any of the officers present in the residence. (Tr. at 20) No one made promises to defendant McGlothen to get him to make the statement. (Tr. at 20) The defendant was not being deprived of anything or punished in any way at the time he made the statement. (Tr. at 22) While members of the tactical team were armed, they did not have their weapons out in a way that would intimidate the defendant into making a statement. (Tr. at 21) Based upon his fifteen years as an officer, Sergeant Huth believes that defendant McGlothen's statements were voluntary. (Tr. at 22) The statements were not the result of any questioning, direct or indirect, by Sergeant Huth. (Tr. at 22) Based upon his interaction with defendant McGlothen, Sergeant Huth believed that the defendant was intelligent and articulate. (Tr. at 21)

16. The police found marijuana in the residence. Defendant McGlothen admitted that he was the only resident of the house and that the marijuana belonged to him. (Tr. at 23)

17. Defendant McGlothen's vehicle was originally going to be towed, but was eventually released to one of McGlothen's family members. (Tr. at 9, 12) The passenger in defendant McGlothen's vehicle was released. (Tr. at 10)

4

III. DISCUSSION

Defendant McGlothen seeks to suppress any and all statements which he is alleged to have made for the following reasons: First, defendant argues that because his stop, search and seizure were illegal, his subsequent statements must be suppressed as the fruit of the poisonous tree. Second, defendant contends any statements he made were not voluntary. Third, defendant asserts that he was not given his Miranda warnings prior to making any statements in violation of the Fifth Amendment.

A. Stop, Search and Seizure

Defendant McGlothen argues that the initial stop, seizure, and search were conducted in violation of the Fourth Amendment. The police stopped defendant McGlothen in his car and arrested him for investigation of distribution of a controlled substance. (See Fact Nos. 6 and 12, supra) A warrantless arrest is proper if it is supported by probable cause. "Probable cause exists where the facts and circumstances within the arresting officers' knowledge are sufficient to warrant a prudent person in believing that the suspect had committed or was committing an offense." United States v. Archer, 840 F.2d 567, 573 (8th Cir.), cert. denied, 488 U.S. 941 (1988)(citing Beck v. Ohio, 379 U.S. 89, 91 (1964)). The determination of probable cause depends on the cumulative effect of the facts in the totality of the circumstances. See United States v. Morales, 923 F.2d 621, 623-24 (8th Cir. 1991).

Probable cause clearly existed to arrest defendant McGlothen. The officers initiating the stop of defendant McGlothen's vehicle had been shown a picture of McGlothen and had been given a description of the vehicle he drove. The officers had been told that McGlothen was a suspect for being involved in undercover drug buys and that a search warrant had been issued for his residence.

5

(See Fact Nos. 1 and 4, supra) If the officers had probable cause to arrest defendant McGlothen, then it follows that the officers had authority to search the defendant[1] and his vehicle[2] incident to arrest. Defendant fails to offer any explanation as to how his arrest and the search of his person and vehicle violated the Fourth Amendment. Therefore, defendant's argument that his statements should be suppressed as fruit of the poisonous tree must be denied.

B.  Voluntariness

Defendant contends that the statements he made were involuntary and, therefore, must be suppressed. The voluntariness of a statement is a question of law. See United States v. Jordan, 150 F.3d 895, 898 (8th Cir. 1998). The government must prove by a preponderance of the evidence that the challenged statements are voluntary. See Lego v. Twomey, 404 U.S. 477 (1972); United States v. Astello, 241 F.3d 965, 966 (8th Cir. 2001). A statement is involuntary if it was extracted by threats, violence, or direct or indirect promises such that a person's will is overborne and his or her capacity for self determination critically impaired. See Astello, 241 F.3d at 967; United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995). Neither psychological tactics nor broken promises alone may be sufficient to render a statement involuntary. See Tippitt v. Lockhart, 859 F.2d 595, 597 (8th Cir. 1988). Thus, the court must look at the totality of the circumstances, including all of the conduct of law enforcement officials and the suspect's capacity to resist pressure in determining if a statement was involuntary. See Jordan, 150 F.3d at 898. Some of the factors the court may

---

[1]Search of an arrestee's person is reasonable under the Fourth Amendment. See United States v. Pratt, 355 F.3d 1119, 1124 (8th Cir. 2004).

[2]When an officer has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile. See New York v. Belton, 453 U.S. 454, 460 (1981).

6

consider in assessing the totality of the circumstances include the age, education and intelligence of the accused; whether the accused has been informed of his constitutional rights; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food or sleep. See Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).

In reviewing the totality of the circumstances as set forth in the above facts, it is clear that any statements made by defendant McGlothen were voluntary. First, defendant McGlothen was intelligent and articulate. (See Fact No. 15, supra) There is no evidence before the Court suggesting that defendant was unable to comprehend what was happening, and in fact, he understood that a search warrant for drugs was being executed by the police and that he was under arrest for investigation of distribution of a controlled substance. (See Fact No.12, supra)

Second, defendant McGlothen made the incriminating statements after having been in the residence with Sergeant Huth for only ten minutes. (See Fact No.15, supra) Sergeant Huth was asking defendant McGlothen standard booking questions and had not subjected him to repeated or prolonged questioning. (See Fact No. 13, supra)

Third, the conduct of the law enforcement personnel present at the search does not suggest that any undue coercion was used against the defendant. Defendant McGlothen was not threatened or intimidated by any of the officers present in the residence. (See Fact No.15, supra) No promises were made to him in exchange for his statement. (See Fact No.15, supra) Defendant McGlothen was not deprived of anything or punished in any way. (See Fact No.15, supra)

According to the totality of the circumstances, defendant McGlothen's statements were voluntary. Although defendant McGlothen was not advised of his constitutional rights prior to making the statements (see Fact Nos.10 and 13, supra), that is only one of several factors the courts

7

examine in order to determine whether a statement was voluntarily made. See Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). The majority of the factors examined in this case indicate that defendant McGlothen's statements were voluntary and, therefore, should not be suppressed.

  C. Miranda

Defendant McGlothen argues that he was not advised of his constitutional rights as required by Miranda v. Arizona, 384 U.S. 436 (1966), and, therefore, his statements must be suppressed as having been obtained in violation of the Fifth Amendment. "The requirements of Miranda arise only when a defendant is both in custody and being interrogated." United States v. Londondio, 420 F.3d 777, 783 (8th Cir. 2005)(citing United States v. Head, 407 F.3d 925, 928 (8th Cir. 2005)). In this case, it is undisputed that defendant McGlothen was in custody and had not been advised of his rights when he made the statements. However, the parties differ as to whether McGlothen was being interrogated at the time.

Interrogation is defined as "express questioning" or words or actions "that the police should know are reasonably likely to elicit an incriminating response ..." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). Routine questions attendant to arrest, booking and custody generally do not constitute interrogation. See United States v. Monzon, 869 F.2d 338, 342 (7th Cir.), cert. denied, 490 U.S. 1075 (1989); United States v. McLaughlin, 777 F.2d 388, 391-92 (8th Cir. 1985). Voluntary statements that are not in response to interrogation are admissible with or without previously giving Miranda warnings. See Londondio, 420 F.3d at 783; Head, 407 F.3d at 928.

According to the facts in this case, Sergeant Huth advised defendant McGlothen that he was under arrest for investigation of distribution of a controlled substance. (See Fact No. 12, supra) Pursuant to the process utilized by the 1910 Tactical Squad, Sergeant Huth asked defendant

8

McGlothen basic questions in order to complete paperwork for booking him. (See Facts Nos. 11 and 13, supra)  For example, Sergeant Huth asked defendant whether he had any medical conditions or if he needed to take medication with him to police headquarters.  (See Fact No.13, supra) When it came to Sergeant Huth's attention that a firearm had been located in the residence, Sergeant Huth advised defendant McGlothen that he was also under arrest for being a felon in possession of a firearm, as he was aware that McGlothen had a prior felony conviction.  (See Fact No. 14, supra) At that time, defendant McGlothen stated that the gun was his and that he had bought the gun for protection.  (See Fact No. 14, supra) When Sergeant Huth reminded defendant McGlothen that his rights had not been read to him and that he was not being questioned about the firearm, McGlothen repeated that he had purchased the gun for protection.  (See Fact No. 14, supra)  The facts do not support the contention that defendant McGlothen was being interrogated at the time he made the incriminating statements regarding possession of the firearm.  The statements made by defendant McGlothen were voluntary statements that were not made in response to any questioning by Sergeant Huth.  Therefore defendant's argument that the statements should be suppressed fails.

## IV.  CONCLUSION

Based upon the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant McGlothen's Motion to Suppress Any and All Statements of Defendant (doc. #22).

Counsel are reminded they have ten days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same.  A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and

Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

/s/ *Sarah W. Hays*
SARAH W. HAYS
United States Magistrate Judge